## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN MANNING, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | **DOCKET NO. 1:07-3109 (RMB)** |
| ) | |
| vs. ) | |
| ) | CLASS ACTION COMPLAINT |
| ) | |
| WORLDSPACE, INC., NOAH A. SAMARA, SRIDHAR GANESAN, UBS SECURITIES, LLC, and COWEN & CO. LLC, ) ) ) | **JURY TRIAL DEMANDED** |
| ) | |
| Defendants. ) ) | |

Plaintiff, Brian Manning ("Plaintiff"), alleges the following based upon the investigation by Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WorldSpace Inc. ("WorldSpace" or the "Company") securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of the publicly traded common stock of WorldSpace who purchased or otherwise acquired WorldSpace common stock pursuant or traceable to the Company's August 4, 2005 Initial Public Offering ("IPO" or the "Offering") through March 16, 2006, seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

2.      WorldSpace, together with its subsidiaries, engages in the design, development, construction, deployment, and financing of a satellite-based radio and data broadcasting service. The company, through its subscription-based service, provides content, multilingual programming, geographic coverage, and advertising.  It offers its services in India, China, Africa, the Middle East, and Western Europe.

3.      In the industry, investors and analysts consider subscriber count and subscriber growth to be a key fundamental in evaluating a Company's business growth, future prospects, and level of success.  The customer statistics that a company reports to investors is extremely important in the industry, and in an investor's evaluation of whether to invest in the company. As such, investors and analysts track and follow these numbers closely.

4.      On August 4, 2005, WorldSpace conducted its IPO.  In connection with the IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the "Registration Statement") with the SEC.  The Company's Registration Statement was materially false and misleading because it failed to disclose that the Company's subscriber count was artificially inflated by Defendant's failure to timely remove those customers who had discontinued their service, and that that the Company was experiencing higher "churn" rates than it was disclosing to investors.  Rather than disclosing this information, the Company continued to count these expired subscriptions as current subscriptions for at least an additional ninety days after the customer terminated the service.

5.      On March 16, 2006, WorldSpace finally disclosed to investors for the first time that its reported number of subscribers was materially inflated because the company lacked the technology to terminate ex-subscribers' service.  On this news, shares of the Company's stock dropped $2.63 per share, or 22 percent, to close on March 17, 2006 at $8.89 per share, on

unusually heavy trading volume.  Over the next two trading days, shares of the Company's stock declined an additional 16 percent and 20 percent, respectively.  In all, this three-day drop caused shares of the Company's stock to decline $5.57 per share, or 48 percent, to close on March 21, 2006 at $5.95 per share, on usually heavy trading volume.

## JURISDICTION AND VENUE

6.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o).

7.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

8.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.   Also, defendant Cowen & Co. LLC is headquartered in this District and defendant UBS Securities maintains offices in this district.  Additionally, the IPO was actively marketed and sold in this District.

9.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10.    Plaintiff, Brian Manning, as set forth in the accompanying certification, incorporated by reference herein, purchased WorldSpace common stock at artificially inflated prices pursuant or traceable to the Company's IPO and has been damaged thereby.

11.     Defendant WorldSpace is a Delaware corporation with its principal place of business located at 8515 Georgia Avenue, Silver Spring, Maryland.

12.     Defendant Noah A. Samara ("Samara") was, at all relevant times, the Company's President, Chairman, and Chief Executive Officer ("CEO").

13.     Defendant Sridhar Ganesan ("Ganesan") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer ("CFO").

14.     Defendant UBS Securities, LLC ("UBS") was an underwriter of WorldSpace's IPO.  Defendant UBS maintains a corporate office at 1285 Avenue of the Americas New York, New York.

15.     Defendant Cowen & Co. ("Cowen") was an underwriter of WorldSpace's IPO. Defendant Cowen maintains its corporate headquarters at 1221 Avenue of the Americas, New York, New York.

16.     Defendants Samara and Ganesan are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of WorldSpace's submissions to the SEC and the market.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.    Defendants UBS and Cowan served as financial advisors and assisted in the preparation of WorldSpace's IPO.  Defendants UBS and Cowan are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

18.    WorldSpace, together with its subsidiaries, engages in the design, development, construction, deployment, and financing of a satellite-based radio and data broadcasting service. The company, through its subscription-based service, provides content, multilingual programming, geographic coverage, and advertising.  It offers its services in India, China, Africa, the Middle East, and Western Europe.

19.    On April 13, 2005, the Company filed its Registration Statement with the SEC. Therein, the Company indicated that it sought to offer 11,868,400 shares of Company stock to the public at a price of $21.00 per shares.

20.    On August 3, 2005, WorldSpace filed a Form S-1/A with the SEC, which was Amendment Number 9 to their IPO Registration Statement.  Therein, the Company, in relevant part, stated:

> This is the initial public offering of 11,868,400 shares of our Class A Common Stock. No public market currently exists for our common stock. We are offering 11,500,000 shares of the Class A Common Stock and a selling stockholder is offering 368,400 shares of our Class A Common Stock offered by this prospectus. We will not receive any of the proceeds from the sale of our Class A Common Stock by the selling stockholder. We expect the public offering price of our Class A Common Stock to be between $18.00 and $20.00 per share.

> Our Class A Common Stock has been approved for quotation on the NASDAQ National Market under the trading symbol "WRSP."

**Materially False and Misleading**
**Statements Issued In the Registration Statement**

21.    On August 5, 2005, the Company's Registration Statement became effective.  The

Registration Statement indicated that WorldSpace sought to sell 11,868,400 million shares of its

common stock to the public at a price of $21.00 per share, raising approximately $249 million.

Additionally, the Company, in relevant part, stated:

> **You should rely only on the information contained in this prospectus.**
>
> \* \* \*
>
> **Revenue**
>
> **We derive revenue from subscription fees for our services**, sales of equipment, our provision of services to governments, leasing of satellite capacity, and certain other items, including technology licensing, subject to the laws and regulations of the countries where we conduct our business. We do not expect our historical revenue mix to be indicative of our future revenue streams. **Since we began to roll out our subscription−based service in India during 2004, subscription revenue has become an increasingly significant component of our revenue. We expect that subscription fees will be the main source of revenue for the Company in the future**, followed by revenue from equipment sales and from the provision of government services.
>
> \* \* \*
>
> **Our business trends**
>
> **We believe that the most important factor for our success will be the successful acquisition and retention of paying subscribers. As of June 30, 2005, we had more than 63,000 paying subscribers**, including more than 27,000 in India. **We have recently refined our business plan and intensified our subscriber acquisition marketing efforts**, focusing first on acquiring subscribers in India and continuing preparation for the roll−out of our service in China, where we have taken steps toward obtaining required regulatory approvals and content partnerships. … **In order for our business model to succeed, we believe that we must ultimately have a world−wide base of subscribers**

6

**numbering in the millions. Our business model contemplates that we will be able to attain such a level of subscribers over the next five years**, although we can not assure that our business model will be achieved.

\* \* \*

As noted above, our satellite and ground network system covering the chosen markets of India and China is substantially completed. However, we expect to incur significant operating losses for the next several years as we first roll out our commercial subscription services in India, then in China and eventually in Western Europe. We expect to fund marketing and distribution costs from the proceeds of this offering as we increase the number of subscribers to our service to a level sufficient to generate a stream of cash flows to cover these and other operating costs. We also intend to enhance our infrastructure in India with the addition of terrestrial repeater (i.e., "gap filler") networks and a next generation of receivers designed to receive broadcasts from our networks of repeaters as well as from our satellites, which will allow us to expand our service offering to include mobile DARS. As described under "—Liquidity and capital resources—Historical sources of cash," while the net proceeds of $142.3 million from our December 2004 sale of senior convertible notes in the aggregate principal amount of $155.0 million (Convertible Notes) together with the net proceeds from this offering are expected to cover our financing requirements to execute our current business plan with respect to India and China, **our ultimate profitability and the timing and extent of any need for additional capital resources are materially dependent on the ability to generate our revenue through substantial increases in subscribers, among other factors.** [Emphasis added.]

22.    On September 7, 2005, the Company issued a press release entitled "WorldSpace Announces Second Quarter 2005 Results." Therein, the Company, in relevant part, stated:

WorldSpace, Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today reported its financial and operating results for the second quarter ended June 30, 2005.

**During the second quarter 2005, WorldSpace continued the rollout of its service in key cities in India, including Bangalore, Chennai, and Hyderabad. As of June 30, 2005, WorldSpace had acquired 63,930 subscribers. This represented net subscriber additions of 11,427 for the quarter, an increase of**

**93 percent over the 5,936 subscribers added in second quarter of 2004.**

For the second quarter of 2005, WorldSpace reported quarterly revenues of approximately $2.3 million, representing a 21 percent increase compared with revenues of approximately $1.9 million for the second quarter of 2004. Subscriber revenue increased 390 percent to approximately $0.8 million for the second quarter of 2005 compared with subscriber revenue of approximately $0.2 million for the second quarter of 2004.

WorldSpace recorded a net loss for the second quarter 2005 of $22.0 million or $0.95 per share compared with a net loss of $52.3 million or $9.04 per share for the second quarter of 2004. WorldSpace had an EBITDA (earnings before interest income, interest expense, income taxes, depreciation and amortization) of $12.0 million for the second quarter 2005, compared with $10.0 million for the second quarter 2004.

**Said Noah Samara, Chairman and Chief Executive Officer of WorldSpace, "The second quarter of 2005 was a critical time for WorldSpace as we prepared for our initial public offering, ramped up our marketing campaign in India and continued planning for the rollout of services in Western Europe and China -- markets where we enjoy a first-mover advantage.** We also continued to form strategic partnerships and add new customer-driven content to our satellite radio offerings, especially in India, an under-served and highly attractive market for our products. Lastly, we continued to provide services to U.S. government agencies under existing contracts, all of which position us well for growth and expansion in the year ahead."

<u>Accelerated Marketing Campaign and Expanded Presence in India</u>

**WorldSpace ramped up its marketing campaign in 2005 after receiving funding at the end of last year.** During the second quarter of 2005, its blended Cost per Gross Addition (CPGA) was $103, compared with $107 CPGA during the second quarter of 2004. Blended CPGA includes the fully-loaded cost to acquire each new subscriber in India and in our other markets such as western Europe, Africa and the Middle East, and includes Subscriber Acquisition Cost (SAC) and other marketing expenses such as advertising and point of sale materials. India CPGA during the three-month period ended June 30, 2005 was $175, compared with $94 for the second quarter of 2004, representing a significant ramp-up in marketing activities this year. WorldSpace's blended SAC for the second quarter of 2005 was $2.04 per subscriber,

8

while the India SAC for the three-month period was $11.96 per subscriber.

<u>Improved Liquidity</u>

WorldSpace had total cash and cash equivalents of $83.3 million as of June 30, 2005.

**Since then, WorldSpace has raised an additional net amount of approximately $244 million through an Initial Public Offering (IPO)** and an investment by XM Satellite Radio Holdings, Inc. (XM). **On August 9, 2005, WorldSpace completed its initial public offering of its Class A Common Stock of 11.5 million shares, raising a total of approximately $222 million in net proceeds for WorldSpace.** On July 18, 2005, WorldSpace issued to XM 1,562,500 shares of Class A Common Stock for an aggregate purchase price of $25 million. In connection with this transaction, WorldSpace entered into a global satellite radio cooperation agreement with XM pursuant to which the companies agreed to cooperate on receiver technology, terrestrial repeater technology, original equipment manufacturer (OEM) and third-party distribution relationships, content opportunities and new applications and services. In addition, Gary Parsons, the Chairman of the board of directors of XM, was elected to the WorldSpace board of directors. In connection with this transaction, WorldSpace also granted to XM a performance-based warrant to purchase 1,785,714 shares of Class A Common Stock.  [Emphasis added.]

23.    On September 8, 2005, the Company filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Samara and Ganesan, and reaffirmed the Company's quarterly results announced on September 7, 2005.  Additionally, the Company's Form 10-Q contained Sarbanes-Oxley required certifications, which stated:

I, [Noah A. Samara / Sridhar Ganesan], certify that:

1.  I have reviewed this quarterly report on Form 10-Q for the quarter ended September 30, 2005 of WorldSpace, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on our evaluation; and

    c.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\* \* \*

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of Section 1350, chapter 63 of title 18, United States Code), the undersigned officer of WorldSpace, Inc., a Delaware corporation (the "Company"), does hereby certify, to the best of such officer's knowledge, that:

1.  The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2005 (the "Form 10-Q") fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934, as amended; and

2.  Information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

24.  On November 7, 2005, the Company issued a press release entitled "WorldSpace Announces Third Quarter 2005 Results; WorldSpace Finishes the Quarter with More Than 75,000 Subscribers, Grows Subscriber Revenue 232%."  Therein, the Company, in relevant part, stated:

WorldSpace, Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today reported its financial and operating results for the third quarter ended September 30, 2005.

WorldSpace finished the quarter with 75,071 subscribers. The Company added 11,141 subscribers in the third quarter this year, an increase of 78 percent over the 6,253 subscribers added in third quarter of 2004. In India, the Company has 35,670 subscribers at the end of the third quarter, of which 7,737 were added between July and September, an increase of 114% over the 3,616 added in the third quarter of 2004. In addition, WorldSpace added over 12,000 subscribers in India in October 2005 as part of its holiday marketing campaign.

At the end of the third quarter, WorldSpace distributed its satellite radio services to six cities in India, consisting of Mumbai, Delhi,

Bangalore, Chennai, Hyderabad and Kochi. In addition services in Pune and Ahmedabad were launched in October. WorldSpace's market distribution is now available to a population of more than 50 million, including nearly 29 million households in the segment of the population that WorldSpace is targeting.

"During the third quarter we have made operational progress that puts us well on the path of delivering strong subscriber growth. This growth is clearly visible in our successful October holiday marketing campaign," said Noah Samara, WorldSpace's Chairman and CEO. "We have significantly increased our marketing and retail presence in key cities in India, expanded our content offering to further enhance an attractive value proposition to the consumer and improved our distribution. We continued to make progress in our business development activities in Europe and in addition in October, we obtained terrestrial repeater licenses in Dubai and Bahrain, the first terrestrial repeater licenses for mobile satellite radio outside of North America, and rolled out new marketing initiatives to the US military and government personnel stationed in our coverage area."

**Quarterly Revenue Accelerates**

For the third quarter of 2005, WorldSpace reported quarterly revenues of approximately $2.4 million, representing a 51 percent increase compared with revenues of approximately $1.6 million for the third quarter of 2004. Subscriber revenue increased 232 percent to approximately $1.0 million for the third quarter of 2005 compared with subscriber revenue of approximately $0.3 million for the third quarter of 2004.

**Net Loss Narrows**

WorldSpace recorded a net loss for the third quarter 2005 of $15.4 million or $0.48 per share, compared with a net loss of $57.3 million or $9.90 per share for the third quarter of 2004, a period that included $30.6 million in interest charges. WorldSpace had an EBITDA (earnings before interest income, interest expense, income taxes, depreciation and amortization) loss of $29.1 million for the third quarter of 2005, compared with an EBITDA loss of $12.1 million for the third quarter of 2004.

**Accelerated Marketing Campaign**

WorldSpace continued to ramp up its marketing campaign during the third quarter of 2005. During the third quarter of 2005, blended Cost Per Gross Addition (CPGA) was $407, compared with $128 CPGA during the third quarter of 2004. Blended CPGA includes

fully-loaded cost to acquire each new subscriber in India and in its other markets and includes Subscriber Acquisition Costs and other marketing expenses such as advertising and point of sale materials. India CPGA during the three-month period ended September 30, 2005 was $508, compared with $97 for the third quarter of 2004, representing a significant ramp-up in marketing activities this year. WorldSpace's blended SAC for the third quarter of 2005 was $27 per subscriber, while the India SAC for the three-month period was $38 per subscriber. In the third quarter 2005, WorldSpace spent $4.9 million on advertising and marketing expenses, of which $4.1 million was spent in India.

**Improved Liquidity from IPO**

WorldSpace had total cash, cash equivalents and marketable securities of $296.5 million as of September 30, 2005. This improved liquidity position resulted primarily from additional financing of approximately $244 million raised during the third quarter of 2005.

On August 9, 2005, WorldSpace completed its initial public offering (IPO) of its Class A common stock of 11.5 million shares, raising a total of approximately $221 million in net proceeds for WorldSpace.  [Emphasis added.]

25.    On November 9, 2005, WorldSpace filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by defendants Samara and Ganesan, and reaffirmed the Company's quarterly results announced on November 7, 2005.  Additionally, the Company's Form 10-Q contained Sarbanes-Oxley required certifications, substantially similar to those set forth at ¶ 23, *supra*.

26.    On December 7, 2005, the Company issued a press release entitled "WorldSpace Satellite Radio Reaches 100,000 Subscribers; Subscribers Embrace WorldSpace's Exclusive Commercial-Free Content."  Therein, the Company, in relevant part, stated:

WorldSpace(R), Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, announced that it recently passed 100,000 subscribers globally -- reinforcing the company's execution against its business plan through the sequential roll out of services in key Indian and other global markets.

WorldSpace services have resonated with consumers across the world, especially in India where the company remains focused on building content and partner networks to increase visibility and drive consumer demand.

"Reaching 100,000 subscribers is an important milestone for WorldSpace and it reflects the effective implementation of our strategic plan, which is to leverage attractive market opportunities for our subscription services," said Noah Samara, chairman and CEO, WorldSpace. "We are very pleased with our progress and we intend to continue aggressive sales and marketing efforts that will enable us to grow our subscriber base."

27.    On January 25, 2006, the Company issued a press release entitled "WorldSpace

Satellite Radio Passes 115,000 Subscribers; WorldSpace Adds a Record 40,000 Subscribers in

the Fourth Quarter 2005"  Therein, the Company, in relevant part, stated:

WORLDSPACE(R), Inc., (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today announced that it finished 2005 with more than 115,000 subscribers globally. During the fourth quarter, WORLDSPACE added more than 40,000 net new subscribers, increasing its subscriber base by more than 50% in the fourth quarter alone.

"The growth rate demonstrates that we are delivering on our plan to drive subscriber growth in India. The value proposition of our offering is being validated by growing the demand for our service," said Noah Samara, chairman and CEO of WORLDSPACE. "We look forward to continue building on our success in 2005 and we are extremely excited about our plans to expand our service throughout India and other focus markets."

At the end of 2005, WORLDSPACE was offering the service in nine cities in India, including Mumbai, New Delhi, Bangalore, Chennai, Hyderabad, Kochi, Pune, Ahmedabad, and Chandigarh, covering a population of approximately 29 million through 650 retail locations and 550 direct sales force agents.

WORLDSPACE anticipates releasing its complete results for the fourth quarter of 2005 on March 16, 2006. Additional information on the timing of the release and the conference call will be announced shortly.

28.    On March 16, 2006, the Company issued a press release entitled "WorldSpace

Announces Fourth Quarter 2005 Results; WorldSpace Finishes 2005 With More Than 115,000

Subscribers Worldwide, Adds Over 40,000 New Customers in Fourth Quarter, Quarterly Subscription Revenue Increases 160% from 2004."  Therein, the Company, in relevant part, stated:

> WorldSpace, Inc. (Nasdaq: WRSP), one of the world leaders in satellite-based digital radio services, today reported its financial and operating results for the fourth quarter and full year ended December 31, 2005.
>
> **WorldSpace finished the year with 115,306 subscribers. The Company added 40,235 subscribers in the fourth quarter of 2005, an increase of approximately 160% over the 15,545 subscribers added in fourth quarter of 2004.** In India, the Company had 74,574 subscribers at the end of the fourth quarter of 2005, up over 100% from 35,670 at the end of the third quarter of 2005 and up nearly 800% from 8,335 at the start of the year.
>
> At the end of the fourth quarter of 2005, WorldSpace had rolled out its satellite radio services in nine cities in India -- Mumbai, Delhi, Bangalore, Chennai, Hyderabad, Kochi, Pune, Ahmedabad and Chandigarh. Service in Kolkata, India's second largest city, was launched in February 2006. WorldSpace's market distribution is now available to a population of nearly 63 million, including nearly 35 million people in the top three economic segments targeted by the Company.
>
> **"WorldSpace made important progress against all of our key operational metrics during the fourth quarter of 2005, especially in delivering strong subscriber growth," said Noah Samara, chairman and chief executive officer, WorldSpace.** "We believe we have gained significant traction in our efforts to acquire new subscribers, and will continue to do so as our visibility and brand awareness grow with the roll-out of our service to additional metropolitan areas, supported by targeted marketing campaigns. We also have made great strides in building our senior management teams, internationally and at the corporate level, by adding quality people with key areas of expertise that will be critical to our forward momentum."
>
> **WorldSpace's 2005 highlights**
>
> - **Added over 80,000 new subscribers during the year, growing global subscriber base to over 115,000 subscribers at year end 2005;**

- Added over 66,000 new subscribers in India during the year, including 40,000 subscribers following the launch of a major marketing and promotional campaign in the fourth quarter of 2005;

- Introduced 19 new programming channels, including the first India sports talk radio channel and many regional language channels in India, as well as the world's first global hip hop channel, bringing the total number of channels broadcast on WorldSpace's global system to 220 by the end of the year;

- Completed an initial public offering (IPO) in August 2005, raising net proceeds of approximately $221 million;

- Raised strategic capital from and formed a technology sharing partnership with XM Satellite Radio in July 2005, including an investment of $25 million by XM Satellite Radio. Also, three-year warrants valued at $37.5 million were issued to XM Satellite Radio exercisable at the IPO price provided XM has made substantial technological contributions to WorldSpace, including in the areas of products, chipsets and terrestrial repeater development and deployment;

- Continued the expansion of our distribution and geographic presence in India, with over 650 retail points of presence in nine cities at the end of the year covering approximately 30 million people in WorldSpace's target market segment of the India population;

- Obtained terrestrial repeater licenses in United Arab Emirates and Bahrain, the first L-band terrestrial repeater licenses for satellite radio.  [Emphasis added.]

29.    The statements contained in ¶¶ 21 – 28 were materially false and misleading when made because defendants failed to disclose or indicate that at the time of the IPO: (1) that the Company's subscriber count was artificially inflated by defendant's failure to timely remove those customers who had discontinued their service following the expiration of the three-month promotional subscription; and (2) that the Company was experiencing higher "churn" rates than it was disclosing to investors.

30.    Under applicable SEC rules and regulations governing the preparation of the Registration Statement, WorldSpace was required to disclose that the Company's subscriber

count was artificially inflated by Defendant's failure to timely remove those customers who had discontinued their service, and that the Company was experiencing higher "churn" rates than it was disclosing to investors.

### The Truth Begins to Emerge

31.    Following the Company's announcement of its quarterly results, the defendants held a conference call with analysts and investors to discuss the Company's quarterly results. It was during this conference call on March 16, 2006 that the defendants revealed for the very first time that a subscriber's service was not immediately disconnected after the subscriber terminated the subscription. During this conference, the defendants, in relevant part, stated:

> TOM WATTS, ANALYST, COWEN & CO: … In terms of your previous 1999 promotions that you began in was is [sic] October I believe, that included three month pre-payment of service. What sort of renewal rates have you seen at the end of the three months as people started roll off of that? How does -- can you just talk about the process of getting people to start paying on a regular basis?

> SRIDHAR GANESAN: Sure. As you know, as you know all, we launched this three months promotional campaign in the first half of October 2005. It was a very successful campaign. We added about 39,000 subscribers just in the fourth quarter after we launched that campaign in India. We have begun to see renewals and disconnect from that promotional campaign beginning to happen now.

> **Well, well we disconnect subscribers when we change passwords. And right now we changed passwords every 90 days. And so we can really get the true estimate of renewals as well as the return from that promotional campaign only at the -- when we actually disconnect these -- when we change the passwords.**

> **We are addressing that from a technological perspective so we can disconnect people earlier and get to these kinds of estimates earlier. But that is the case.** But what I can tell you is that we did do a customer satisfaction survey after we launched the

promotional campaign. And as Noah said 97% of those surveyed said that they would recommend the service to others or have already recommended. Another 94% are very satisfied with the, with the content and the service. And then the mid 70% they said that they'll renew the service based upon a certain pricing plan. And that number goes up based upon multi year plans that we maybe able to offer as well.

**So right now we cannot give you the right -- exact variable numbers or the general numbers.** But clearly the satisfaction surveys show that it's a question of execution and we are executing right now. We've got a renewal plan in place. Our team in India are working hard, making all the contacts that they have make to get these subscribers renewed.

TOM WATTS: And when does the next password change?

SRIDHAR GANESAN: End of this month.

32.     On this news, shares of the Company's stock dropped $2.63 per share, or 22 percent, to close on March 17, 2006 at $8.89 per share, on unusually heavy trading volume. Over the next two trading days, shares of the Company's stock declined an additional 16 percent and 20 percent, respectively.  In all, this three-day drop caused shares of the Company's stock to decline $5.57 per share, or 48 percent, to close on March 21, 2006 at $5.95 per share, on usually heavy trading volume.

33.     In an analyst report published following the Company's conference call on March 16, 2006, Kundal Madhukar, CFA and Robert S. Peck, CFA of Bear Stearns issued a research report on WorldSpace's shocking revelations.  In addition to expressing a pessimistic and cautionary view of the Company's operational plans, these analysts, in relevant part, stated:

**Key takeaways from the quarter included the following.** …

**Renewal activity on the promotions ongoing, but clear picture will only be available at cut-off dates.**

**At the end of each quarter (or contract term which could be up to 2 years), WorldSpace subscribers are required to enter a password on their receivers to continue receiving the service.**

**This means that if the subscribers on the initial 3-month period (that is included in the Rs.1,999 price) choose not to renew, WorldSpace has no way of "disconnecting" their service prior to the end of the quarter. As such, the number of subscribers added in 4Q05 that are on the promotional service period who opt to convert to full paying subscriptions will not be known until after 1Q06 ends.** The conversion rate will be a key metric to watch in the future quarters. In a survey conducted for the company, WorldSpace found high satisfaction levels with the service with 97% of the subscribers saying that they would recommend the service to other people. However, only about 70% of the respondents stated that they would continue with the subscription.

**Additional clarity on gross additions and churn may become important next quarter.**

Given the focus on renewal rates and the prospect of incremental competition from terrestrial FM radio stations, **we think it would become important for the company to disclose information on gross additions and churn beginning with the next quarter.** Currently, we understand that reported SAC primarily includes the loss on equipment sales; however, in 4Q05, the company took an inventory revaluation charge, which skewed the calculation. In addition, the reported CPGA also cannot be used with the total marketing expense number to estimate gross additions.  [Emphasis added.]

34.    Then on March 24, 2006, Cowen & Co. issued a report on WorldSpace that contained a timeline illustrating how WorldSpace continued to includ customers terminated their subscription in the Company's current subscriber count.  The report, in relevant part, detailed:

**Illustrative Customer Timeline**

| | |
|---|---|
| **October 10** | Customer purchases system and 3-month pre-paid subscription |
| **October 15** | System installed. 3- month subscription period begins |
| **December 15** | Customer receives bill for renewal one month before end of subscription, with renewal options of 6 months, 1 year or 2 years. |

| January 1 | Phone call to customer 2 weeks prior to end of subscription regarding renewal |
| --- | --- |
| January 15 | Subscription expires. 60-day grace period begins. |
| January 15 - March 31 | Phone calls, door-to-door visits, mail contacts attempt to renew customer. |
| March 15 | Grace period ends. **Customer should be counted as churned. However, password system prevents customer turn-off.** [Emphasis added] |
| March 31 | WorldSpace undertakes quarterly password change. Shuts off non-paying customers |
| March 31 - April 15 | WorldSpace attempts to renew customers now that service has been shut-off. We do not know how long after that shut-off WorldSpace counts that customer as churned. |
| Early May | WorldSpace reports churn statistics for customers that purchased the system in October |

**As illustrated by the timeline above, WorldSpace's current password-based system and its constraint that it can only reset passwords once quarterly, complicates that churn calculation. It also means that even by May, the company will not have churn data for any customers that signed up after October 31, since a November 1 customer's grace period would not end until April 1, and his password could not be changed until June 30.**

* * *

**[T]he current password-based system . . . enable[s] a number of nonpaying free riders to continue to receive WorldSpace programming for free during the period after the expiration of their grace period, but before the next password re-set.** [Emphasis added.]

35.    Then on May 9, 2006, WorldSpace held an earnings conference call with analysts

and investors.  During this call, the defendants, in relevant part, stated:

> KUNAL MADHUKAR, ANALYST, BEAR STEARNS: … **You mentioned that you have a reasonable amount of time before you disconnect a subscriber, a non-paying subscriber? What is a reasonable amount of time?**
>
> SRIDHAR GANESAN: We allow a certain grace period.
>
> KUNAL MADHUKAR: Which is 30 days? 60 days? Or 45 Days?
>
> SRIDHAR GANESAN: **Right now the average is about 60 days.**
>
> KUNAL MADHUKAR: **So 60 days after the end of the quarter?**
>
> SRIDHAR GANESAN: **After the end of the subscription.**

36.    On August 9, 2006, WorldSpace held another earnings conference call with

analysts and investors.  During this call, the defendants, in relevant part, stated:

> TOM WATTS, ANALYST, COWEN AND COWEN: … I know you were doing quarterly shut-offs. You did one in March and another in-- was it June 30 that you did that? And did that-- the number that we include, does that exclude people who are shut off as of the June 30th shut-off date, or are many of those people still in the grace period?
>
> SRIDHAR GANESAN: The standard-- I told you that the average grace period was 60 days. And we apply that, and at the end of it, people get shut off. **So the end-of-period subscribers on June 30th will include those that are within that grace period as well. Does that answer your question?**
>
> TOM WATTS: Anyone who's beyond 60 days was not included in the subscriber count
>
> SRIDHAR GANESAN: It's not included; it's not included in the subscriber count; that's right.
>
> TOM WATTS: And if they happen to be over 60 days as of June 30th, they would have been shut off -- is that correct?
>
> SRIDHAR GANESAN: In our-- as far as subscriber count is concerned, yes, absolutely. **Till we fix the technology issue**, **those**

**that are still remaining, even beyond the grace period, so until
we change the password, they will continue to get the service.**
But when we disconnect, then they come back. And as we told you
before, we change the password every 3 months. So that last one
was in July. Beginning of July, we had a password change. We did
on in early April and we did another one in early July. So if
somebody had still over time beyond the grace period that we
have, they would have got cut off then. [Emphasis added.]

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired WorldSpace common stock pursuant or traceable to the Company's August 4,

2005 IPO through March 16, 2007, and who were damaged thereby (the "Class").  Excluded

from the Class are defendants, the officers and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns

and any entity in which defendants have or had a controlling interest.

38.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, WorldSpace's common stock was actively traded

on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds or thousands of members in the proposed Class.  Record owners and other members of

the Class may be identified from records maintained by WorldSpace or its transfer agent and

may be notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

39.    Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

40.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

41.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

      b.     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of WorldSpace; and

      c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

43.     The market for WorldSpace's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, WorldSpace's common stock traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired

WorldSpace common stock relying upon the integrity of the market price of WorldSpace's securities and market information relating to WorldSpace, and have been damaged thereby.

44.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of WorldSpace's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

45.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about WorldSpace's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of WorldSpace and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

46.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

47.   During the Class Period, Plaintiff and the Class purchased the common stock of WorldSpace at artificially inflated prices and were damaged thereby.  The price of WorldSpace's common stock declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

48.   At all relevant times, the market for WorldSpace's common stock was an efficient market for the following reasons, among others:

a.   WorldSpace stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regulated issuer, WorldSpace filed public reports with the SEC and NASDAQ;

c.   WorldSpace regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   WorldSpace was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

49.     As a result of the foregoing, the market for WorldSpace's common stock promptly digested current information regarding WorldSpace from all publicly-available sources and reflected such information in WorldSpace's stock price.    Under these circumstances, all purchasers of WorldSpace common stock during the Class Period suffered similar injury through their purchase of WorldSpace common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of WorldSpace who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 11 of
### The Securities Act Against All Defendants

51.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud,

scienter or the intent of the defendants to defraud Plaintiff or members of the Class. This count is predicated upon defendants' strict liability for making false and materially misleading statements in the Registration Statement.

52. This claim is asserted by Plaintiff against all defendants by and on behalf of persons who acquired shares of the Company pursuant to or traceable to the false Registration Statement issued in connection with WorldSpace's IPO.

53. Individual Defendants as signatories of the Registration Statement, as directors and/or officers of WorldSpace and controlling persons of the issuer, owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct, and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

54. Underwriter Defendants owed to the holders of the stock obtained through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading. Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Registration Statement as set forth herein. As such, defendants are liable to the Class.

55.    None of the defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true, or that there was no omission of material facts necessary to make the statements made therein not misleading.

56.    Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, *inter alia*, the facts set forth above.  By reason of the conduct herein alleged, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act.

57.    As a direct and proximate result of defendants' acts and omissions in violation of the Securities Act, the market price of WorldSpace stock sold in the IPO was artificially inflated and Plaintiff and the Class suffered substantial damage in connection with their ownership of WorldSpace common stock pursuant to the Registration Statement.

58.    WorldSpace is the issuer of the stock sold <u>via</u> the Registration Statement.  As issuer of the stock, the Company is strictly liable to Plaintiff and the Class for the material misstatements and omissions therein.

59.    At the times they obtained their shares of WorldSpace, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

60.    This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus.

61.    By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the defendants and each of them, jointly and severally.

### SECOND CLAIM
### Violation of Section 12(a)(2) of
### The Securities Act Against All Defendants

62.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Class , against all defendants.

64.    Defendants were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the WorldSpace's Registration Statement.

65.    The WorldSpace's Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.  The Individual Defendants' actions of solicitation included participating in the preparation of the false the misleading Registration Statement.

66.    Defendants owed to the purchasers of WorldSpace common stock, including Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the IPO materials, including the Registration Statement, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

67.    Plaintiff and other members of the Class purchased or otherwise acquired

WorldSpace common stock pursuant to and/or traceable to the defective Registration Statement. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement.

68.    Plaintiff, individually and representatively, hereby offer to tender to defendants that common stock which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such common stock, in return for the consideration paid for that common stock together with interest thereon.  Class members who have sold their WorldSpace common stock are entitled to rescissory damages.

69.    By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold WorldSpace common stock purchased in the IPO have the right to rescind and recover the consideration paid for their WorldSpace common stock, and hereby elect to rescind and tender their WorldSpace common stock to the defendants sued herein.  Plaintiff and Class members who have sold their WorldSpace common stock are entitled to rescissory damages.

70.    This action is brought within three years from the time that the common stock upon which this Count is brought was sold to the public, and within one year from the time when Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### THIRD CLAIM
### Violation of Section 15 of The Securities Act
### Against the Individual Defendants

71.    Plaintiff repeats and realleges each and every allegation contained above, excluding all allegations above that contain facts necessary to prove any elements not required to

state a Section 15 claim, including without limitation, scienter.

72.    This count is asserted against Individual Defendants and is based upon Section 15 of the Securities Act.

73.    Individual Defendants, by virtue of their offices, directorship and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of WorldSpace within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause WorldSpace to engage in the acts described herein.

74.    Individual Defendants' position made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

75.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 17, 2007                    Respectfully submitted,

                                         **BRODSKY & SMITH, LLC**

                                         By:_s/ Evan J. Smith, Esquire (ES3254)_
                                         Evan J. Smith, Esquire (ES3254)
                                         240 Mineola Boulevard
                                         Mineola, NY 11501
                                         (516) 741-4977
                                         (516) 741-0626 (facsimile)

                                         **SCHIFFRIN BARROWAY
                                         TOPAZ & KESSLER, LLP**
                                         Richard A. Maniskas
                                         D. Seamus Kaskela
                                         280 King of Prussia Rd.
                                         Radnor, PA 19087
                                         (610) 667-7706
                                         (610) 667-7056 (fax)

                                         **Attorneys for Plaintiff**